UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

NICHOLE D. SHARTS,                    :
                                      :
            Plaintiff                 :        No. 4:11-CV-00432
                                      :
        vs.                           :        (Judge Kosik)
                                      :
MICHAEL J. ASTRUE,                    :          **FILED**
COMMISSIONER OF SOCIAL                :        **SCRANTON**
SECURITY,                             :
                                      :
            Defendant                 :          JUL 2 4 2012

                    MEMORANDUM            PER _____
                                              DEPUTY CLERK

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Nichole D. Sharts's claim for social security

disability insurance benefits and supplemental security income

benefits.

        On November 29, 2007, Sharts protectively filed[1] an

application for disability insurance benefits and an application

for supplemental security income benefits. Tr. 64, 88 and 96-102.[2]

---

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on May 9,
2011.

On March 14, 2008, the Bureau of Disability Determination[3] denied

Sharts's applications. Tr. 15 and 66-73.  On April 24, 2008,

Sharts requested a hearing before an administrative law judge. Tr.

74.  After about 18 months had passed, a hearing was held on

November 3, 2009, before an administrative law judge. Tr. 26-46.

On November 23, 2009, the administrative law judge issued a

decision denying Sharts's applications. Tr. 15-22.  On December

18, 2009, Sharts requested that the Appeals Council review the

administrative law judge's decision. Tr. 10-11.  After 13 months

had passed, the Appeals Council on January 12, 2011, concluded

that there was no basis upon which to grant Sharts's request for

review. Tr. 1-3.  Thus, the administrative law judge's decision

stood as the final decision of the Commissioner.

Sharts then filed a complaint in this court on March 7,

2011.  Supporting and opposing briefs were submitted and the

appeal[4] became ripe for disposition on October 14, 2011, when

Sharts elected not to file a reply brief.

Disability insurance benefits are paid to an individual

if that individual is disabled and "insured," that is, the

---

3.  The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.  Tr. 66 and 70.

4.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Sharts met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 16, 17, 92 and 103.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Sharts, who was born in the United States on March 1, 1985,[5] graduated from high school in June, 2003 and can read, write, speak and understand the English language and perform basic mathematical functions.  Tr. 31, 106 and 112.  During her elementary and secondary schooling Sharts attended regular education classes. Tr. 112.  Sharts in 2004 obtained a cosmetology license. Id.

Sharts has a limited work and earnings history. She has work experience as a waitress, bartender, cosmetologist, and

---

5.  At the time of the administrative hearing and the administrative law judge's decision, Sharts was 24 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

patient aide in a personal care home. Tr. 108.   It was determined

by the administrative law judge that Sharts had no prior or past

relevant work experience that amounted to substantial gainful

activity.[6] Tr. 21.

Records of the Social Security Administration reveal

that Sharts had earnings in the years 1999 through 2006 as

follows:

| | |
|------|----------|
| 1999 | $  324.12 |
| 2000 | 22.78 |
| 2001 | 1970.24 |
| 2002 | 3761.04 |
| 2003 | 4452.17 |
| 2004 | 5967.01 |
| 2005 | 6120.90 |
| 2006 | 7397.61 |

Tr. 93. Sharts's total earnings from 1999 through 2006 were

$30,015.87. Id.

Sharts claims that she became disabled on March 23,

2007,[7] because of degenerative joint disease of the bilateral

_____

6.  Past relevant employment in the present case means work
performed by Sharts during the 15 years prior to the date her
claim for disability was adjudicated by the Commissioner. 20
C.F.R. §§ 404.1560 and 404.1565.  However, in order to be
considered past relevant work the earnings from it have to rise
to a certain level set forth in the regulations of the Social
Security Administration.

7.  Sharts in her application for disability insurance benefits
alleged that she became disabled on October 10, 2000, and in her
application for supplemental security income on October 15, 2005.
Tr. 96 and 99.  However, at the administrative hearing and in her
brief in support of the present appeal, Sharts indicated that her
alleged disability onset date was March 23, 2007. Tr. 32; Doc.
12, Plaintiff's Brief, p. 1.  The record further reveals that
(continued...)

4

knees, arthritis, a torn anterior cruciate ligament (ACL) of the right knee,[8] and depression. Tr. 10, and 107. Sharts has not worked since December 24, 2006. Tr. 107.

In a document entitled "Function Report -Adult" Sharts stated she lives with her boyfriend. Tr. 114. In that document she also elaborated on her family responsibilities, including taking care of her daughter. Specifically, Sharts stated that "I wake up in the morning [and] take care of my daughter when I am not looking after her I'm watching TV - sitting for 10-15 minutes at a time then standing 10-15 minutes at a time." Id.  Sharts stated that she did not need any reminders to take care of personal grooming or to take her medicines. Tr, 116. Sharts is able to prepare simple meals. Tr. 116.  She is able to drive, shop in stores, pay bills, count change, handle a savings account, and use a checkbook and money orders. Tr. 117.  Her primary hobby is watching TV which as noted above she does in a sitting and standing position. Tr. 118.  Sharts admitted that she visits with friends at her home. Id.  When given an opportunity to do so,

---

7.  (...continued)
Sharts filed prior applications for disability insurance and supplemental security income benefits. Tr. 15.  Those applications were denied at the administrative level and Sharts did not pursue a federal court action with respect to those denials.  Consequently, the prior denials are res judicata and the relevant time period in this action is from March 23, 2007, through November 23, 2009, the date of the administrative law judge's decision. Id.

8.  The medical records reveal a history of bilateral knee surgery.

Sharts did not indicate that she had a problem with reaching, talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using her hands, and getting along with others. Tr. 119. Sharts also stated that she was prescribed a cane by her treating physician. Tr. 120. However, her treating physician reported that she did not require a cane to ambulate. Tr. 181. After completing the function report, Sharts had a second child. Tr. 30. At the administrative hearing, Sharts stated her children were ages 2 and 9 months old. Id. Sharts admitted that she could pick up off the floor her 20 pound son. Tr. 34.

For the reasons set forth below we will affirm the decision of the Commissioner denying Sharts's applications for disability insurance benefits and supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Factual findings which are supported by substantial evidence must

be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,

38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported

by substantial evidence, we are bound by those findings, even if

we would have decided the factual inquiry differently."); Cotter

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by

the Secretary must be accepted as conclusive by a reviewing court

if supported by substantial evidence."); Keefe v. Shalala, 71

F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176

(4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529

n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or

considerable amount of evidence, but 'rather such relevant

evidence as a reasonable mind might accept as adequate to support

a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,

229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d

198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360

(3d Cir. 1999). Substantial evidence has been described as more

than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213. In an adequately developed factual

record substantial evidence may be "something less than the weight

of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971). A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence. Mason, 994
F.2d at 1064. The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707. Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole. Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).
Furthermore,

[a]n individual shall be determined to be under a

8

> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has

---

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
(continued...)

an impairment or combination of impairments that meets or equals
the requirements of a listed impairment,[11] (4) has the residual
functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id. As part of step four the administrative law judge
must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary

---

10. (...continued)
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b). An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience." Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

12. If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

work setting on a regular and continuing basis.  <u>See</u> Social

Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

regular and continuing basis contemplates full-time employment and

is defined as eight hours a day, five days per week or other

similar schedule. The residual functional capacity assessment must

include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R.

§§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an

individual is still able to do despite the limitations caused by

his or her impairment(s).").

**MEDICAL RECORDS**

   At this point we will review briefly the anatomy of the

knee and some of Sharts's medical records.

   The knee is made up of the following three bones: the

tibia (shinbone), the femur (the thigh bone) and the patella (the

kneecap).  The femur and tibia meet to form a hinge joint which is

protected in the front by the patella.  The ends of the tibia and

femur and the underside of the patella are covered by cartilage

which acts to cushion the knee joint. The entire knee joint is

enclosed in a capsule lined with special tissue called synovium,

which produces a thick liquid called synovial fluid and which is

necessary to lubricate the knee joint.  The knee is kept in

alignment by ligaments and tendons.  There are two large

ligaments, the cruciate ligaments, in the center of the knee which cross each other which prevent the shinbone from moving forward and backward on the thighbone. There are also ligaments on both sides of the knee: the medial collateral ligament and the lateral collateral ligament and which provide stability when the knee moves from side to side. Between the thighbone and the shinbone are two rings of cartilage called menisci which provide stability and cushion the joint, acting as shock absorbers. The medial meniscus is closest to the center of the body and the lateral meniscus is the farthest away from the center of the body. The medial meniscus is partially attached to the medial collateral ligament. The lateral meniscus is not attached to the lateral collateral ligament. There are also two major tendons connected to the kneecap: (1) the tendon below the kneecap is called the patellar tendon although technically it is a ligament since it connects the kneecap or patella to another bone, the tibia or shinbone, and (2) the tendon above the kneecap is the quadriceps tendon. See, generally, Elizabeth Quinn, Knee Anatomy and Physiology, About.com:Sports Medicine, http://sportsmedicine. about.com/od/kneepainandinjuries/a/Knee_Anatomy.htm (Last accessed July 13, 2012); Vicent Iannelli, M.D., Knee Problem Treatment Guide: Major Structures of the Knee, About.com:Pediatrics, http://pediatrics.about.com/cs/conditions/a/knee_problems_2.htm.

(Last accessed July 13, 2012); Carol & Richard Eustice, The Cause of Knee Pain: Step-By-Step, About.com:Arthritis, http://arthritis.about.com/od/arthritisbyanatomy/ss/causejointpain_2.htm (Last accessed July 13, 2012).

On October 17, 2005, Sharts had a follow-up appointment with her primary care physician Jose E. Nazar, M.D., regarding recent left knee arthroscopic surgery. Tr. 177.  Dr. Nazar noted that Sharts was "doing fine and [had] no pain or discomfort." Id. Stitches were removed from Sharts's knee. Id.  There was no evidence of phlebitis[13] and the Homans's sign[14] was negative. Id.

At an appointment with Dr. Nazar on October 28, 2005, Sharts complained of pain and discomfort. Id.  A physical examination revealed that Sharts had full range of motion of the knee, there was no evidence of locking or phlebitis, and Lachman's, McMurray's and Homans's signs or tests were all negative.[15] Id.

---

13.  Phlebitis is defined as "inflammation of a vein[.]" Dorland's Illustrated Medical Dictionary, 1433 (32nd  Ed. 2012).

14.  The Homans's sign or test is to determine whether a patient is suffering from a deep calf vein thrombosis (formation of a blood clot). Dorland's Illustrated Medical Dictionary, 1712 (32nd Ed. 2012).

15.  The McMurray's test or sign is to determine whether there is a meniscal tear.  The Drawer's or Lachman's test or sign is to determine whether there is a rupture of the anterior or posterior ligaments of the knee. See Dorland's Illustrated Medical

(continued...)

On November 11, 2005, Dr. Nazar after examining Sharts noted that he did "not feel that clinically there is any catching or instability" and that Sharts's knee had "full [range of motion]." Id.

On April 21, 2006, Sharts had an appointment with Dr. Nazar "for follow-up of left knee arthroscopy as well as ACL reconstruction of the right knee." Tr. 176. The physical examination portion of Dr. Nazar's treatment notes states in toto as follows: "Today full range of motion of the knees with pain in the last degree of internal/external rotation. Lachman, McMurray test negative. I will place the patient on a course of Naproxen.[16] As well, she is inquiring for the possibility of applying for disability. I explained to the patient that due to her age, she is only 21 years of age, it will be quite difficult because I think she has possibility to do sedentary type work." Id. (emphasis added).

In notes of a May 5, 2006, appointment Dr. Nazar stated as follows: "I filled in papers for her for disability. At the present time she states that she has pain and discomfort, feeling

---

15.   (...continued)
Dictionary, 1888 & 1893-1894 (32nd  Ed. 2012).

16.   Naproxen (some brand names include Aleve and Anaprox) is a nonsteroidal anti-inflamatory drug which reduces hormones that cause inflammation and pain in the body. Naproxen, Drugs.com, http://www.drugs.com/naproxen.html (Last accessed July 13, 2012).

of giving way in the knee. The right knee seems to be fine. I will recommend to continue with range of motion exercise, stretching exercise. If symptoms persist, we will repeat MRI to rule out new tear or remains of tear. Clinical-wise, she has full range of motion of the knee. Lachman, McMurray test negative. No evidence of phlebitis at the present time."[17] Tr. 175.

On June 20, 2006, Sharts had an "[u]nremarkable MRI of the left knee." Tr. 172.

In notes of a June 26, 2006, appointment Dr. Nazar stated in pertinent part as follows: "We reviewed the MRI and the last set of x-rays from May and June. It is perfectly normal, no evidence of tear of the cartilage or ligaments." Tr. 175.

Between June 26, 2006 and February 5, 2007, there are no treatment notes where Dr. Nazar recorded objective medical findings. Tr. 168 and 175.

In notes of a February 5, 2007, appointment Dr. Nazar stated in toto as follows: "Patient is here today for follow up of bilateral knee pain and low back pain and thoracic pain. She has had the pain in her back since she had her car accident 3 years ago, but it has been on and off, never really requested evaluation

---

17. Dr. Nazar's treatment notes do not clearly delineate Sharts's subjective complaints and his objective findings. Dr. Nazar consistently lumps together Sharts's subjective complaints and his objective findings in one paragraph.

until the present time.  She has pain with flexion and extension.
No neurological deficit.  Probably just muscular in nature.  At
the present time we will not schedule any x-rays.  For her knees,
she continues with the same pain and discomfort.  We will fill in
a document for incapacity.  She will return on an open visit after
her pregnancy for reevaluation." Tr. 168.

Between the February 5, 2007, appointment and February
20, 2008, there are no treatment notes where Dr. Nazar recorded
objective medical findings. Tr. 168.  It appears there were
appointments on February 20 and December 10, 2007, but only
subjective complaints were recorded by Dr. Nazar. Id.

Even though Dr. Nazar had not seen Sharts since
February, 2007, Dr. Nazar wrote a letter to Sharts's attorney on
July 9, 2007, which states in pertinent part as follows:

> I believe, this patient, with all the findings at the
> time of the surgeries as well as the recent MRIs, she
> has post traumatic arthritis in both knees that will
> impair this patient on a permanent basis to perform
> any kind of activity that requires to sit for a long
> time.  She will have problems sitting for more than
> 1-2 hours at a time because of locking of the knees.
> As well, she will have problems doing long time
> standing.  I don't think she will be able to stand in
> one position for more than 30 minutes at a time without
> requiring alternative sitting and alternative moving.
> Based on my opinion with previous MRIs, clinical
> presentation, findings at the time of the arthroscopic
> surgery, the history of the reconstruction of the
> ACL and multiple arthroscopic surgeries in both knees, I
> believe that this patient is fully incapacitated to
> perform any type of work at the present time that will
> require long time sitting, long time standing,

16

> repetitive bending, kneeling or walking on uneven ground
> or walking up and down steps, obviously pulling,
> climbing, squatting are all out of the question and I
> believe this will be on a permanent basis.

Tr. 174.

In notes of a February 20, 2008, appointment Dr. Nazar
stated in toto as follows: "Today for follow up of bilateral knee
pain and low back pain.  She has persisted with pain and
discomfort in the knees even with daily activities.[18]  She has
pain in the last degree of flexion and extension, especially when
she performs any activity which requires long-time sitting, long-
time standing. She has pain. She is status post ACL reconstruction
and arthroscopic surgery of the knees. On physical examination
today, she has pain the last degrees of flexion and extension,
some instability of the leg. She required further treatment with
exercises of the quadriceps to increase the power of the
quadriceps. At the present time, she is no candidate for any type
of surgery. This patient, as well, at the present time is fully
incapacitated to perform any type of activity that requires long-
time sitting, long-time standing, repetitive bending or squatting
with the knees.  She will continue taking pain medication, anti-

---

18.  This is an example of Dr. Nazar recording Sharts's
subjective complaint.

17

inflammatory medicine.  She will return for follow up in 8 weeks.
I filled in forms for her to apply for disability." Id.

In notes of a May 12, 2008, appointment Dr. Nazar stated
in toto as follows: "Today for follow-up of pain at the level of
the left knee.  She has full [range of motion] of the knee. We
reviewed the MRI. No evidence of tear of the cartilage or
ligaments. She seems to be having a recurrence of synovitis.[19] I
proceeded under sterile technique to inject with cortisone.  She
is going to take ibuprofen and return for follow up in 6 weeks,
sooner if any problems." Tr. 169.

The next appointment where Dr. Nazar made objective
findings was on October 13, 2008. Id.  The notes of that
appointment state in toto as follows: "Today for follow up of low
back pain, bilateral knee pain. She has continued with some
discomfort of the knees. Physical examination: Both knees without
evidence of effusion.[20] The Homan's sign is negative. The Lachmann
and McMurray tests are negative. For the low back, pain in the

---

19.  Synovitis is defined as "inflammation of a synovium; it is
usually painful, particularly on motion, and is characterized by
a fluctuating swelling due to effusion within a synovial sac."
Dorland's Illustrated Medical Dictionary, 1856 (32nd  Ed. 2012).

20.  An effusion is a swelling caused by a collection of fluid.
See Dorland's Illustrated Medical Dictionary, 595 (32nd Ed.
2012).

last degree of flexion and extension.[21]  No neurological deficits. I will continue treatment as for bursitis, tendonitis of the lower extremities and low back pain.  She will return for follow up in 4 months, sooner if any problems." Id.

In notes of a May 11, 2009, appointment Dr. Nazar stated in toto as follows: "Today for follow-up of low back pain, bilateral knee pain.  She has continued with pain and discomfort in both knees in flexion and extension with daily activities as well as pain at the level of the thoracic-lumbar junction.  She has mild muscle spasms.  She will continue with conservative treatment, pain medication, NSAIDS, mild ROM exercise and return for follow up in 12 weeks." Tr. 170.

Finally, on October 25, 2009, Dr. Nazar completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on behalf of Sharts. Tr. 179-185.  Dr. Nazar found that Sharts could (1) frequently (1/3 to 2/3 of an 8-hour workday) lift and/or carry 10 pounds; (2) occasionally (up to 1/3 of an 8-hour workday) lift and/or carry 20 pounds; sit 3 hours, stand 2 hours and walk 1 hour in an 8-hour workday; and occasionally climb stairs and ramps, balance, stoop and kneel but never crouch or crawl and never climb ladders or scaffolds. Tr. 180-181 and 183.

---

21.  This suggests that Sharts ·had full range of motion but had some pain when reaching the full range.

19

Dr. Nazar also stated that Sharts could sit 2 hours, stand 1 hour and walk 1 hour at one time without interruption. Tr. 181.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Sharts has not engaged in substantial gainful work activity since March 23, 2007, the alleged disability onset date. Tr. 17.  The administrative law judge stated that "[a] printout of [Sharts's] earnings record shows that her last reported wages were in calendar year 2006 in the amount of $7,397.61 . . . and her testimony reveals that she has not worked since." Tr. 18.

At step two of the sequential evaluation process, the administrative law judge found that Sharts had the following severe impairments: "degenerative joint disease of both of her knees." Id.  The administrative law judge found that Sharts's low back pain was a non-severe impairment because a treating physician indicated that she only had mild muscle spasms in the lower back, there were no imaging studies which revealed a problem with her back, and Sharts reported to her treating physician that "her back has been good." Id.

At step three of the sequential evaluation process the administrative law judge found that Sharts's impairments did not

20

individually or in combination meet or equal a listed impairment.
Id.

At step four of the sequential evaluation process the
administrative law judge found that Sharts has no past relevant
work but that she had the residual functional capacity to perform
a limited range of light work (treated as sedentary work). Id.  In
other words Sharts met the lifting and carrying exertional
requirements of light work (20 pounds occasionally and 10 pounds
frequently) but she did not meet the standing and walking
exertional requirements of light work (6 hours in an 8-hour
workday). Instead she was limited to 1 hour of standing and
walking and 8 hours of sitting with a sit/stand option at will.
Id.  Sharts was further limited to occasional balancing, stooping
and climbing but she could never climb ladders, kneel, crouch, or
crawl and she had to avoid temperature extremes, humidity,
vibrations and hazards. Id.

In concluding that Sharts had the residual functional
capacity to engage in this limited range of work, the
administrative law judge relied on the opinion of Anne C. Zaydon,
M.D., a state agency physician who reviewed Sharts's medical
records. Tr. 19 and 157-162. Dr. Zaydon found that Sharts could
occasionally lift and/or carry 20 pounds, frequently lift and/or
carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour

workday, and sit about six hours in an 8-hour workday. Id. The
administrative law judge also relied on the assessment of Dr.
Nazar with respect to Sharts's lifting and carrying ability. Tr.
18-19. However, the administrative law judge rejected Dr. Nazar's
opinion that Sharts could only sit for 3 hours, stand for 2 hours
and walk 1 hour in an 8-hour workday. Tr. 19 and 181. The
administrative law judge explained her rejection of Dr. Nazar's
limitations regarding Sharts's ability to sit as follows:

> The undersigned Administrative Law Judge gives great
> weight to Dr. Nazar's lifting, standing and walking
> restrictions considering that they are well supported
> by the objective evidence of record but gives little
> weight to his sitting restrictions as there is nothing
> in his treatment records to support any sitting
> restrictions. The claimant's only established
> impairment is the bilateral degenerative joint disease
> of the knees.  Further, although Dr. Nazar lists an
> antalgic gait, he also reports that the claimant is
> full weight-bearing, does not require any assistive
> device for ambulation and only uses [nonsteroidal
> anti-inflammatory drugs]. . . Also, Dr. Nazar's
> treatment records covering the period of October 2005
> to October 2009 reveal that he has been seeing her for
> follow-up regarding her knees but there are no real
> objective findings or deficits nor nothing about her
> back nor upper extremities that would limit her ability
> to sit[.]

Tr. 19. The administrative law judge further found that Sharts's
statements concerning her limitations were not credible to the
extent that they were inconsistent with the ability to perform a
limited range of light work (treated as sedentary work). Tr. 20.

22

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work(treated as sedentary work) as described above and the testimony of a vocational expert found that Sharts had the ability to perform work as a surveillance system monitor, bench assembler and visual inspector, and that there were a significant number of such jobs in the regional, state and national economies.[22] Tr. 22.

The administrative record in this case which primarily consists of vocational and medical records is 186 pages in length and we have thoroughly reviewed that record. The administrative law judge did an excellent job of reviewing Sharts's vocational history and medical records in her decision. Tr. 17-22. Furthermore, the brief and statement of material facts submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Docs. 16 and 17, Defendant's Brief and Statement of Material Facts.

Sharts  argues that the administrative law judge erred (1) in rejecting the opinion of Dr. Nazar regarding Sharts's

-------------------

22.  The jobs identified by the vocational expert and found by the administrative law judge to be within the capability of Sharts were all sedentary positions. Tr. 44. They further allowed Sharts to change positions at will. Tr. 45.

ability to sit only 3 hours and (2) in failing to adequately develop the record. We find no merit in Sharts's arguments.

The medical opinion of a treating physician as to the nature and severity of an impairment is only entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case. 20 C.F.R. § 404.1527(d). In this case the administrative law judge adequately explained why she rejected the opinion of Dr. Nazar regarding Sharts's ability to sit. There is a lack of objective medical findings in the record supporting Dr. Nazar's sitting restriction. In fact Dr. Nazar's functional assessment of October 25, 2009, is internally inconsistent. Dr. Nazar indicated that Sharts can only sit for 3 hour, stand for 2 hours, and walk for 1 hour in an 8-hour workday but that Sharts can lift and/or carry up to 10 pounds for up to 2/3 of an 8 hour workday or 5.33 hours. To carry an object weighing ten pounds for 5.33 hours a person is either standing or walking. This is inconsistent with Dr. Nazar's statement that Sharts's can only stand for 2 hours and walk for 1 hour. Furthermore, we reject Sharts's contention that the administrative law judge engaged in inappropriate lay analysis of the medical records. She merely observed that there was a lack of objective medical findings supporting Dr. Nazar's sitting

24

restriction. Also, it is important to point out that Dr. Nazar's sitting restriction is in conflict with the medical opinion of Dr. Zaydon regarding Sharts's ability to sit.

Sharts's second argument is that the administrative law judge did not properly develop the record. An administrative law judge has an affirmative obligation to develop the record. Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

In this case we are satisfied that the administrative law judge complied with her affirmative obligation to develop the record. Specifically, the administrative law judge obtained Sharts's medical records for the relevant period. Also, Sharts was represented by an attorney during the administrative proceedings and that same attorney represents Sharts in the present appeal. Although counsel argues that the ALJ should have recontacted Dr. Nazar, Counsel has not proffered or produced any additional evidence from Dr. Nazar of Sharts's condition during

the period at issue.  Furthermore, an ALJ is only required to recontact a medical source if the evidence is insufficient for the ALJ to make a decision. 20 C.F.R. §§ 404.1512(e) and 416.912(e).

The evidence in this case was sufficient. The record contains a functional assessment from a state agency medical consultant who reviewed Sharts's medical records. The administrative law judge's reliance on that assessment was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately evaluated Sharts's severe and non-severe impairments and took into account Sharts's functional limitations in the residual functional capacity assessment. In fact the administrative law judge gave Sharts the benefit of the doubt and reduced Sharts's residual functional capacity below the level found appropriate by Dr. Zaydon.

As noted above, the administrative law judge stated that Sharts's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work (treated as sedentary work).  The

administrative law judge was not required to accept Sharts's

subjective claims regarding her physical limitations.[23] See Van

Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that

credibility determinations as to a claimant's testimony regarding

the claimant's limitations are for the administrative law judge to

make). It is well-established that "an [administrative law

judge's] findings based on the credibility of the applicant are to

be accorded great weight and deference, particularly since [the

administrative law judge] is charged with the duty of observing a

witness's demeanor . . . ." Walters v. Commissioner of Social

Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v.

Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.

1991)("We defer to the ALJ as trier of fact, the individual

optimally positioned to observe and assess the witness

credibility."). Because the administrative law judge observed

---

23. Sharts did not present any evidence regarding a psychiatric
impairment. The Social Security regulations require that an
applicant for disability insurance and supplemental security
income benefits come forward with medical evidence "showing that
[the applicant] has an impairment(s) and how severe it is during
the time [the applicant] say[s] [he or she is] disabled" and
"showing how [the] impairment(s) affects [the applicant's]
functioning during the time [the applicant] say[s] [he or she is]
disabled." 20 C.F.R. §§ 404.1512(c) and 416.912(c). Sharts
failed to provide such evidence. No treating physician or
psychologist provided a statement indicating that Sharts had
mental functional limitations for the requisite continuous 12
month period that would prevent her from engaging in the limited
range of light work(treated as sedentary work) set by the
administrative law judge.

Sharts when she testified at the hearing on November 3, 2009, the administrative law judge is the one best suited to assess the credibility of Sharts.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.